Bert F. DUESING, Appellant,

v.

Stewart L. UDALL, Secretary of the
Interior, Appellee.

George Hall DOUGLASS, Appellant,

v.

Stewart L. UDALL, Secretary of the
Interior, Appellee.

Gene B. GRAHAM, Appellant,

v.

Stewart L. UDALL, Secretary of the
Interior, Appellee.

Rodney L. JOHNSTON, Appellant,

v.

Stewart L. UDALL, Secretary of the
Interior, Appellee.

H. Willard NAGLEY, Jr., Appellant,

v.

Stewart L. UDALL, Secretary of the
Interior, Appellee.

E. E. RASMUSON, Appellant,

v.

Stewart L. UDALL, Secretary of the
Interior, Appellee.

Milan RAYKOVICH, Appellant,

v.

Stewart L. UDALL, Secretary of the
Interior, Appellee.

Robert B. ATWOOD, Appellant,

v.

Stewart L. UDALL, Secretary of the
Interior, Appellee.

Nos. 17358, 17403–17409.

United States Court of Appeals
District of Columbia Circuit.

Argued May 26, 1965.

Decided June 30, 1965.

Petition for Rehearing En Banc
Denied Sept. 23, 1965.

Mr. Max Barash, Washington, D. C., for appellant in No. 17358.

Mr. H. St. John Butler, Washington, D. C., for appellants in Nos. 17403–17409.

Mr. Edmund B. Clark, Atty., Dept. of Justice, with whom Asst. Atty. Gen. Ramsey Clark, Messrs. Roger P. Marquis and Herbert Pittle, Attys., Dept. of Justice, were on the brief, for appellee.

Before DANAHER, Circuit Judge, BASTIAN, Senior Circuit Judge, and LEVENTHAL, Circuit Judge.

LEVENTHAL, Circuit Judge:

These are appeals from orders granting summary judgment to appellee, Secretary of the Interior, and dismissing the complaints of appellants. The lawsuits sought to establish the invalidity of the decision of the Secretary of the Interior closing the southern half of the Kenai National Moose Range in Alaska for oil and gas leasing, in consequence of which appellants' noncompetitive applications were rejected. We affirm.

The Moose Range was created in 1941 by Executive Order No. 8979, 6 F.R. 6471, by which approximately two million acres of the public domain were set aside "as a refuge and breeding ground for moose." Between December 1955 and January 1958, noncompetitive oil gas lease applications relating to acreage in the southern half of the Moose Range were filed by appellants pursuant to section 17 of the Mineral Leasing Act, as amended (30 U.S.C. § 226). Appellants contend that these offers, which were consistent with, and it is claimed "invited" by, the regulations then in effect (Circular 1945, approved December 6, 1955, 20 F.R. 9009), conferred a vested right in appellants which was unlawfully impaired and cancelled by the Secretary's actions in refusing to lease, done pursuant to revision of the regulation (Circular 1990, January 8, 1958, 23 F.R. 227).

The background of the regulations pertaining to leasing of wildlife refuge lands (see 43 C.F.R. 192.9), and a description of their increasingly restrictive quality, are set forth in Udall v. Tallman, 380 U.S. 1, at 5–14, 85 S.Ct. 792, 13 L.Ed. 2d 616 (1965). The 1955 regulation was more restrictive than an initial 1947 regulation, which had simply required that leases be subject to an approved unit plan and required the Secretary's consent prior to drilling. By an interagency memorandum dated August 31, 1953, the Interior Department suspended action on all pending oil and gas lease applications for lands within wildlife refuges, pending completion of a study and possible revision of policy and regulations. The 1955 regulation gave increased power to the Fish and Wildlife Service to avoid impairment of usefulness of the lands for wildlife conservation purposes. Certain areas were declared "not available for leasing," other areas were available under restrictions. As to the areas in question the regulation provided: "Oil and gas leases may be issued for other lands administered by the Fish

and Wildlife Service" provided they contain specified conditions requiring approval by the Fish and Wildlife Service of the type of prospecting to be conducted, and adoption by the lessee of a unit plan approved by the Service. In 1956 bills were introduced seeking Congressional restriction of oil and gas leasing in wildlife refuges. Instead, an arrangement was worked out, for an experimental period, whereby proposals for lease would be submitted, for approval or disapproval within 60 days, to the House Committee on Merchant Marine and Fisheries. In July 1956, that Committee concluded that administrative proposals for leases for 71,680 acres in the northern half of the Moose Range "would not be detrimental to the wildlife values of the Moose Range" and concurred therein.

The Secretary's 1958 revision of the regulation "represented a near total victory for the conservationists." It was a general prohibition of oil and gas leasing in wildlife refuges. Alaska was an exception and here it was provided that agreements were to be reached by the Bureau of Land Management and the Fish and Wildlife Service, specifying lands not subject to leasing and provisions required in leases on the remaining lands, to be effective upon approval by the Secretary. The Secretary published notice in the Federal Register on August 2, 1958, 23 F.R. 5883, of an agreement he had approved July 24, 1958, which set forth that certain lands in the Moose Range (essentially the southern half comprising about 1,689 square miles) "are hereby closed to oil and gas leasing because such activities would be incompatible with management thereof for wildlife purposes." About 1,525 square miles covering the northern half of the range was left open to leasing.

I

Appellants fail in their contention that they obtained a vested right with their applications since it lay entirely within the discretion of the Secretary whether or not to issue leases on the lands involved.

Section 17 of the Mineral Leasing Act of 1920, 41 Stat. 437, 30 U.S.C. § 181, as amended to and including the Act of August 8, 1946, 60 Stat. 950, read insofar as pertinent:

"Sec. 17. All lands subject to disposition under this Act which are known or believed to contain oil or gas deposits may be leased by the Secretary of the Interior. When the lands to be leased are within any known geological structure of a producing oil or gas field, they shall be leased to the highest responsible qualified bidder by competitive bidding under general regulations, * * *. When the lands to be leased are not within any known geological structure of a producing oil or gas field, the person first making application for the lease who is qualified to hold a lease under this Act shall be entitled to a lease of such lands without competitive bidding."

█ Under section 17 it is permissive or discretionary whether or not the Secretary will issue a lease on lands believed to contain oil or gas deposits. What is mandatory is who is to get the lease if it is decided that a lease will be issued —if there is a known geologic structure, the highest bidder; if not, the applicant first in line.

As we said in Haley v. Seaton, 108 U.S.App.D.C. 257, 262, 281 F.2d 620, 625 (1960), the legislative intent was "to give the Secretary of the Interior discretionary power, rather than a positive mandate to lease." More recently the Supreme Court said in *Tallman* (380 U.S. at 4, 85 S.Ct. at 795):

"Although the Act directed that if a lease is issued on such a tract [not within a known geologic structure of a producing oil and gas field], it must be issued to the first qualified applicant, it left the Secretary discretion to refuse to issue any lease at all on a given tract."

█ The filing of an application which has not been accepted does not give any right to a lease, or generate a legal in-

terest which reduces or restricts the discretion vested in the Secretary whether or not to issue leases for the lands involved.

## II

■ Without specifying which appellants make which arguments, we address ourselves to a collection of contentions assailing the Secretary's exercise of his discretion. It is contended that the Secretary's authority permits refusal to lease "on a given tract" (see *Tallman*), but not on a large area of 1,689 square miles. A subsidiary contention is that the Secretary's 1958 action amounted to an indirect "withdrawal" that did not comply with the Pickett Act of June 25, 1910, 36 Stat. 847, 43 U.S.C. § 141 *et seq.*, which requires that withdrawals be reported to Congress, and further did not comply with the regulations providing for notice and public hearings prior to making withdrawals. Circular 1982, August 12, 1957, 22 F.R. 6613, 43 C.F.R. 295.

Assistant Secretary Carver's thoughtful decision in the case of Richard K. Todd et al., 68 I.D. 291, pointed out that the Secretary of Interior had not exercised his withdrawal power. Thus the Secretary had not designated his action as "public land orders" which is required as to withdrawal by Executive Order No. 10355 of May 26, 1952 (17 F.R. 4831), whereby the President expressly delegated to the Secretary the authority to withdraw public lands. Mr. Carver further stated (68 I.D. at 296):

> "Stripped of all authority to withdraw lands, the Secretary would still have his discretionary authority to refuse to issue leases where he thinks issuance would not be in the public interest.

> "The formal exercise by the Secretary of his discretionary authority is nothing new in the administration of the Mineral Leasing Act." Reference is made to actions whereby the Department formalized the cessation of leasing in New Mexico in 1939 (4 F.R. 1012), in Iranpah Valley, California in 1942, and in the wilderness areas of the Los Padres National Forest, California, and the Sante Fe National Forest, New Mexico, in 1953 (Departmental Order 2714, 18 F.R. 700).

■ We show great deference to the construction and application of a statute by the officers charged with its administration, Udall v. Tallman, *supra*, at 16, and cases cited. The construction recorded in the *Todd* decision presents 'a reasonable viewpoint, supported by the administrative practice cited therein. We find that the Secretary has not exceeded his authority under section 17.

■ Appellant Duesing starts off from the general proposition that an agency's authority to issue implementing regulations contemplates regulations in furtherance of the act and winds up with the conclusion that the Secretary can only exercise his discretion under the Mineral Leasing Act by taking action in furtherance of the objective of that act to promote mineral development in the public domain. We reject the argument that in answering the question, to lease or not to lease, the Secretary must ignore the primary objectives of holding and using the land and consider solely the purpose of the lease. This tail wags dog construction is not put forward as supported by legislative history and we see no warrant for overturning what is at least a reasonable administrative construction. Indeed the argument would not even merit discussion were it not stressed by counsel knowledgeable in the field and supported by vigorous statements of the late Senator O'Mahoney, former Chairman of the Subcommittee on Public Lands.[1] Of course Senator O'Mahoney's 1958 and 1959 comments

---

1. Senator O'Mahoney's letter of January 24, 1958, to the Chairman of the Senate Committee on Interior and Insular Affairs, and his letter of January 26, 1959, to the members of the Committee, appear in "Executive Modification of the Mineral Leasing Act on Federal Wildlife Lands" 1, iii, 85th Cong., 2d Sess. (Comm. Print 1959).

are no part of the legislative history of the Mineral Leasing Act, passed in 1920 and amended through 1946. His spark did not catch fire with the other members of his Committee, and the hearings he requested were never held. The 1956 House Committee actions described above reflect a contrary approach.

It is not insignificant that when the Mineral Leasing Act was amended in 1960, section 17 was left substantially intact, notwithstanding obvious Congressional awareness of the Secretary's construction of the law, and his deliberate adherence to that construction notwithstanding Senator O'Mahoney's sharp protest against alleged executive usurpation of authority. The implication of legislative approval[2] is heightened by the fact that the 1960 amendment was enacted after extensive hearings held on the bill and predecessor measures sponsored by Senator O'Mahoney, and that the bill was described as having two purposes: First, to make certain changes of substance in the Mineral Leasing Act shown by experience to be desirable; second, to restate sections 17 and 27 (described as amended so much over the years "that they have become something of a hodgepodge"), restating them "in their entirety to clarify the language."[3] The initial sentence of section 17, which was dominant in the thinking of the Secretary and the courts, was left intact.

Finally, some appellants allege that the Secretary's closing of the southern half of the Moose Range from leasing was arbitrary and capricious, because "oil and gas exploration and development is compatible with the management of the Range for wildlife purposes." Or in the words of the *Todd* decision, appellants purport "to demonstrate that 'oil is compatible with moose' or that the division made is illogical."

 Appellants do not contradict Assistant Secretary Carver's statement in the *Todd* decision that at the hearing held December 9 and 10, 1957,[4] on the proposed revision of 43 C.F.R. 192.9, there was testimony both in support of and in opposition to advocates of leasing. The agreement by the Bureau of Land Management and the Fish and Wildlife Service represented their considered judgment that the division made is the proper method of balancing the several components of the public interest in this area. In a case like this the court does not seek to make a de novo determination. It suffices if there was reasonable basis for the executive department to reach its conclusion. Appellants have not made a tender sufficient to overcome the presumption of validity of administrative action. The court does not presume to substitute its discretion for that of the Secretary.

Affirmed.

2. National Lead Co. v. United States, 252 U.S. 140, 146, 40 S.Ct. 237, 64 L.Ed. 496 (1920); Boesche v. Udall, 373 U.S. 472, 482–483, 83 S.Ct. 1373, 10 L.Ed.2d 491 (1963); Fishgold v. Sullivan Drydock & Repair Corp., 154 F.2d 785, 790–791 (2d Cir. 1946).

3. S. Rep. No. 1549, 86th Cong. 2d Sess. 1 (1960) U.S.Code Congressional and Administrative News, p. 3313.

4. The hearing was held pursuant to notice in the Federal Register of October 11, 1957 (22 F.R. 8088), which clearly stated that all or part of the Alaska wildlife areas might be closed to mineral leasing.

In view of this notice and hearing we see no merit in the contention that there was a procedural defect in the adoption of the regulation. Sec. 4 of the Administrative Procedure Act, 5 U.S.C. § 1003, is inapplicable, since this was a regulation relating to "public property." McNeil v. Seaton, 108 U.S.App.D.C. 296, 301, 281 F.2d 931, 936 (1960).