LAKETON ASPHALT AND REFINING, INC., Plaintiff,

v.

UNITED STATES DEPARTMENT OF the INTERIOR and Cecil Andrus, Secretary, U. S. Department of the Interior, Defendants.

No. F 77–20.

United States District Court,
N. D. Indiana,
South Bend Division.

July 17, 1979.

John H. Heiney, Rothberg, Gallmeyer, Fruechtenicht & Logan, Fort Wayne, Ind., Howard P. Trockman, Trockman, Flynn & Probert, Evansville, Ind., for plaintiff.

Lawrence R. Liebesman, Dept. of Justice, Washingon, D. C., John S. Leonardo, Asst. U. S. Atty., United States District Court, South Bend, Ind., for defendants.

## MEMORANDUM

GRANT, Senior District Judge.

### Factual Background

Section 36 of the Mineral Lands Leasing Act of February 25, 1920 (30 U.S.C. § 192), provides that royalties accruing to the United States under public domain oil or gas leases shall, on demand of the Secretary of the Interior, be paid in kind, i. e., in oil or gas. As originally passed, the Act directed the Secretary to retain these resources for the use of the United States or, in general, to offer them for sale at public auction.

The practice of selling royalty oil to the highest bidder apparently resulted in purchase domination by the larger oil companies and, accordingly, in 1946 Congress amended Section 36 (60 Stat. 533) in order to assist small business oil refineries not having their own source of crude oil supply:

> The purpose of the bill is to give small refineries that do not have an adequate source of crude oil the right to purchase government royalty oil at the price established by the Secretary of the Interior. It is a meritorious piece of legislation. It merely permits small business enterprises such as small refineries to remain in operation or to re-open if they have been closed down because of their inability to buy crude oil.

Cong.Record: S.680, 79th Cong. 2d Session, Vol. 92, Part 7 at 8160 (1946); Statement by the bill's sponsor, Rep. Barrett of Wyoming.

The text of the Amendment directs the Secretary, "when he determines that sufficient supplies of crude oil are not available in the open market", to grant a preference in selling to those refiners who qualify as a small business enterprise under the rules of the Small Business Administration, and who are unable to purchase in the open market an adequate supply of crude oil to meet the needs of their existing refinery capacities.

The Act specifically provides "[t]hat in selling such royalty oil the Secretary of the Interior may at his discretion prorate such oil among such refineries in the area in which the oil is produced." 30 U.S.C. § 192. The legislative history of the Amendment clearly substantiates the fact that Congress intended to accord complete discretion to the Secretary in administering the bill, and to provide for this geographical preference.[1]

Accordingly, the regulations implementing the Amendment provide that refineries qualifying for the royalty oil will be classified as "eligible refiners", and those eligible refiners applying for purchase of oil produced in a given area for use in their refineries within that area shall be further categorized as "preference eligible refiners". The latter is given preference over the former in the ability to purchase such oil.[2] 30 C.F.R. § 225.

The record reveals that petitioner is a small, independent refinery qualifying as an "eligible refiner" under the Act and, during the period from May 1971 to June 1976, had obtained its supply of crude oil (approximately 7,900 barrels per day) through royalty oil contracts with the Department of the Interior pursuant to this program. These purchases were made from the Casper, Wyoming, district supply depot, located in the Northern Rocky Mountain Area, and transported to petitioner's place of business in northeastern Indiana by way of interstate pipeline.[3]

These contracts were generally of three years duration, and in July 1976 Laketon applied for approximately 6,600 barrels of crude per day—again with the Casper, Wyoming, office. Until that time, petitioner had had no difficulty in obtaining its oil requirements from this source because there was little competition among small refiners for the royalty oil, and thus the needs of "eligible refiners", such as Laketon, could be easily met without being given

---

[1.] In debate on the House floor the following colloquy between the sponsor of the bill and another Congressman took place:

> Mr. Kean: Can the gentleman explain how the Secretary of the Interior will decide in favor of any particular oil company?
>
> Mr. Barrett: The bill provides that small refineries operating in the area in which the oil is produced may request the Secretary to sell them government royalty oil at the price established by the Secretary, and it authorizes the Secretary to prorate the oil according to needs as he deems proper.
>
> Mr. Kean: It is entirely at the discretion of the Secretary of the Interior?
>
> Mr. Barrett: That is right. The Secretary must administer the bill, and the discretion must lay in his hands.

In a letter to the Senate Chairman for the Committee on Public Lands and Surveys, the then Acting Secretary of the Interior, Abe Fortas, summarized his understanding in this regard:

> If in a particular area the same royalty oil be desired by several refineries all entitled to a preference, I am assuming that the bill vests complete discretion in the Secretary of the Interior to determine to whom the oil should

be sold in accordance with his findings as to how the public interest would best be served.

[2.] 30 C.F.R. § 225.3 reads in part:

> When applications are filed by two or more "preference eligible refiners" for the same oil, the oil will be allocated among such applicants by a drawing or on an equitable prorated basis as determined by the Supervisor (of the area). . . . When applications are filed by two or more "eligible refiners" for the same oil, and no applications for the same oil are filed by "preference eligible refiners", or their needs are adequately supplied with only a part of the royalty oil available, the royalty oil available to such "eligible refiners" shall be similarly allocated among them by the Supervisor.

[3.] The oil purchased from this source is apparently ideally suited to petitioner's operations because of its high sulfuric content. In addition, within the Eastern Area, in which the petitioner would be classified a "preference eligible" refiner, there is apparently no practical or economically convenient supply of government onshore royalty oil available for purchase.

secondary consideration to the needs of those who qualified as "preference eligible refiners". This situation began to change in early 1973 because of the growing disparity between the supply of domestic crude oil and refining capacity. The oil embargo of late 1973 intensified that disparity.

Accordingly, petitioner's 1976 purchase application elicited the response that all available royalty oil from that Area, with the exception of approximately 4,300 barrels per day, would be allotted to "preference eligible refiners", and that petitioner would have to divide this residue with four other applicants who were similarly located outside the Northern Rocky Mountain Area.[4]

Section 225.3 of the regulations implementing the sale of government royalty oil provides in part that this preferential status accorded certain eligible refiners should be adhered to unless special circumstances, "as determined by the Secretary", warrant otherwise. Pursuant to this section, Laketon filed what it termed an "emergency request for relief", citing the extreme hardship that would result to it if this preference eligibility section of the regulations were followed.

A conference hearing was held in Washington, D.C., on October 1, 1976, to discuss this petition for relief, and a reply letter from the Acting Assistant Secretary of the Interior described to petitioner the reason why no amelioration would be forthcoming:

The Department is appreciative of circumstances in which Laketon presently finds itself. However, an assent to your request . . . [for special relief] . . . would be contrary to our current policies and procedures for administering the royalty oil program. Once an exception is made, the precedent is established for further exceptions that would ultimately lead to a situation which would make it impossible to impartially administer the program.[5]

Petitioner now seeks injunctive relief in this court urging that denial of these royalty oil benefits will result in significant increases in operational costs thereto, and argues that such denial is a violation of the Fifth Amendment's Due Process Clause, as that provision comprehends the equal protection of the laws, because other refineries, which are located in the Northern Rocky Mountain Area, are statutorily entitled (as petitioner is not) to priority over the receipt of royalty oil produced from that area.

■ It is contended that such preference based solely on geographic location is an arbitrary and irrational classification impermissible under that Clause, and that it conflicts with the primary policy objectives of the Emergency Petroleum Allocation Act of 1973 and corresponding regulations. The court first addresses this latter issue.[6]

4. Three of the four other applicants were geographically located outside the Northern Rocky Mountain Area but within the Central Region, exemplifying the fact that the critical distinction with regard to this preference is with area, rather than regional, location.

5. See reply letter dated 2/2/77, p. 2.

6. Petitioner alleges that its interest in maintaining a continued supply of this oil is a "property interest" within the meaning of the Due Process Clause, and non-renewal of the purchase contract constitutes an unconstitutional taking without just compensation.

It is now axiomatic that Due Process imposes constraints upon governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment. *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). " 'Liberty' and 'property' are broad and majestic terms,"

*Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 571, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548 (1972), "[b]ut the range of interests protected by procedural due process is not infinite." *Id.* at 570, 92 S.Ct. at 2705. Mr. Justice Stewart defined its parameters in *Roth, supra* :

To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. . . . Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Id.* at 577, 92 S.Ct. at 2709.

*Statutory Conflict*

■ In 1973 Congress enacted the Emergency Petroleum Allocation Act (Pub.L.No. 93–159) in response to its findings that shortages of crude oil and other petroleum products existed or were imminent.[7] It was determined that the best method for averting or minimizing this national threat to the American people and the domestic economy was to grant the President of the United States "specific temporary authority" to deal with such shortages. Congress provided a list of policy objectives which the program was, "to the maximum extent practicable", designed to accomplish.[8]

Petitioner highlights certain of these provisions which are allegedly in conflict with the geographical preference scheme set forth in the Mineral Leasing Act outlined above.[9] Accordingly, it is urged that the statute last in time should prevail and thus this "preference eligible" scheme should be struck down.

Mr. Chief Justice Hughes, in 1939, summarized the guidelines courts are to follow when construing two legislative acts dealing with the same subject:

> . . . the rule is to give effect to both if possible. . . . The intention of the legislature to repeal 'must be clear and manifest'. . . . There must be 'a positive repugnancy between the provisions of the new law and those of the old; and even then the old law is repealed by

While the court appreciates petitioner's "need" and "desire" for this government royalty oil, Section 192 of the Mineral Leasing Act under which it is provided simply creates no right or entitlement to it. The Supreme Court in *Udall v. Tallman*, 380 U.S. 1, 4, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965) noted that "[t]he Mineral Leasing Act . . . 30 U.S.C. § 181 *et seq.* . . . gave the Secretary of the Interior broad power to issue oil and gas leases [on certain public lands] . . ." and that ". . . it left the Secretary discretion to refuse to issue any lease at all on a given tract."

Interpreting that section of the Act concerning the issuance of oil and gas leases, Judge Leventhal, in *Duesing v. Udall*, 121 U.S.App. D.C. 370, 350 F.2d 748 (1965), states that: "[t]he filing of an application which has not been accepted does not give any right to a lease, or generate a legal interest which reduces or restricts the discretion vested in the Secretary whether or not to issue leases for the lands involved." *Id.* 121 U.S.App.D.C. at 372–373, 350 F.2d at 750, 751.

The court believes that Section 192 which similarly provides for an application filing process (Reg. Part 225.5), and which ". . . reserves to the Secretary of the Interior the right to reject all bids whenever within his judgment the interest of the United States demands . . .", mandates likewise.

The case at bar is not a situation where the government has chosen to disregard the terms of a contractual agreement, *cf. T.A. Moynahan Prop., Inc. v. Lancaster Village Co-op, Inc.*, 496 F.2d 1114 (7th Cir. 1974), for the royalty oil contracts existing here have expired or will expire by their own terms. Nor is contract renewal in this case, absent misconduct, a matter of right. *See Jackson v. United States*, 103 F.Supp. 1019 (Ct.Cl.1952). In addition, the economic benefits involved in this program in no way relate to basic human needs, such as nursing home care and government provided medicaid benefits, *cf. Klein v. Mathews*, 430 F.Supp. 1005 (D.C.N.J.1977); *Hathaway v. Mathews*, 546 F.2d 227 (7th Cir. 1976); and thus those cases, cited for the proposition that once Congress decides to provide benefits of sufficient substance to the public it is no longer free to discontinue these benefits arbitrarily, are not dispositive.

What is involved here is the government bestowal of an economic benefit—the making of government oil available for purchase—on certain small business oil refineries. The Secretary, after according petitioner an opportunity to present its contentions for special exception from the regulations, has merely decided that current policies and procedures for administering the royalty oil program would be better served by strict adherence to the defined regulatory prescriptions. This action appears consonant with both the legislative intent and the expressed commands of the Act and is, in the court's belief, constitutionally permissible.

7. *See Condor Operating Co. v. Sawhill*, 514 F.2d 351 (Temp.Emer.Ct.App.1975), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1975, 44 L.Ed.2d 467. Act may be found at 15 U.S.C. § 751 *et seq.*

8. See Appendix II.

9. For example, it is contended that the allocation of royalty oil to preferred refiners first, gives those businesses a distinct economic advantage over other eligible refiners and is contra to the policies of the Emergency Petroleum Allocation Act in that it inhibits rather than fosters competition, restricts petitioner's ability to operate at full capacity, distorts economic efficiency, and is generally inequitable.

implication only, pro tanto, to the extent of the repugnancy.' (Citations omitted.) *United States v. Borden Co.*, 308 U.S. 188, 198–199, 60 S.Ct. 182, 188, 84 L.Ed. 181 (1939). This doctrine was reaffirmed by the Supreme Court in *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976), where it was noted that:

> It is a basic principle of statutory construction that a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum. 'Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment.' (Citations omitted.)

> \* \* \* \* \* \*

> It is . . . a cardinal principle of statutory construction that repeals by implication are not favored. *United States v. United Continental Tuna Corp.*, 425 U.S. 164, 168, 96 S.Ct. 1319, 1323, 47 L.Ed.2d 653, 658.

*Id.* at 153, 154, 96 S.Ct. at 1992–93.

The Emergency Petroleum Allocation Act "expresses a mandate phrased in broad permissive terms." *Air Transport Association of America v. Federal Energy Office*, 382 F.Supp. 437, 446 (D.D.C.1974). Its legislative history indicates that the goals enumerated by Congress were "equally ranked", and that "these goals would necessarily conflict at times and . . . the President (or his delegate) would likewise necessarily be required to exercise discretion ('administrative flexibility') in their implementation." *Id.* at 446.

> The listing of objectives in successive paragraphs (A) through (I) in section 4(b)(1) is not intended to establish any order of priority. These are collective goals, and the conferees have not attempted to discern an order of precedence or value one against another. It is fully recognized that, in some instances, it may be impossible to satisfy one objective without sacrificing the accomplishment of another. . . . For this reason the Committee has qualified the direction to the President . . . that the regulation be so constructed as to accomplish the enumerated objectives 'to the maximum extent practicable.' This qualification is intended to give the President administrative flexibility in marshalling short supplies and assigning them to particular needs.

> H.R.Conf.Rep.No.93–682. U.S.Code Cong. and Admin.News, 93d Cong. 1st Sess. pp. 2688, 2688–2689 (1973) (hereinafter "Conf.Rep."); *see also* H.R.Rep.No.93–531, U.S.Code Cong. and Admin.News, 93d Cong. 1st Sess. pp. 2582, 2590 (1973).

*Air Transport*, 382 F.Supp. at 445.

As was noted in *Air Transport, supra*, these objectives outlined by Congress ". . . are inherently inconsistent, and no regulation could promote all of them at the same time. . . . A balancing . . . is required, and Congress has left the details of this balancing to the Federal Energy Administration." *Id.* at 447.

In a 1975 publication of proposed rules, that Agency declared that "the [Department of the Interior] royalty oil program is consonant with and indeed furthers the objectives of the Emergency Petroleum Allocation Act of 1973." [10]

Not only is it a well settled principle that great deference should be granted to the interpretations of statutes and implementing regulations by the agency charged with administering them [11] but, in addition, the court finds no "positive repugnancy between the provisions of the new law and those of the old", *U. S. v. Borden, supra*, and accordingly holds that both statutes can in this instance be given simultaneous effect.

*Meat Job. Ass'n., Inc. v. Cost of Living Coun.*, 481 F.2d 1388 (Em.App.1973).

---

10. See 40 Fed.Reg. 18182 (1975).

11. See *Udall v. Tallman*, 380 U.S. 1, 16–18, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Pacific Coast*

*Equal Protection*

The Fifth Amendment to the Constitution of the United States provides in pertinent part that no person shall "be deprived of life, liberty, or property, without due process of law". Although the Fifth Amendment contains no equal protection clause, it does forbid discrimination that is so unjustifiable as to be violative of due process. *Jimenez v. Weinberger*, 417 U.S. 628, 94 S.Ct. 2496, 41 L.Ed.2d 363 (1974); *Johnson v. Robinson*, 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1973); *Frontiero v. Richardson*, 411 U.S. 677, 680, n.5, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973); *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

Under "traditional" equal protection analysis a legislative classification must be sustained unless it is "patently arbitrary" and bears no rational relationship to a legitimate governmental interest. *Frontiero v. Richardson*, supra, 411 U.S. at 683, 93 S.Ct. 1764. (Citations omitted.)

It is contended here, that preference eligible refiner status based solely on geographic location is arbitrary and irrational bearing no relationship to the governmental interest in the furthering of assistance to all eligible refiners. Plaintiff's motion, p. 25. Petitioner argues that less restrictive alternatives for providing royalty oil were available, such as prorating among all competing and eligible small business refineries, or holding hearings to evaluate the relative needs of all competing refiners; and the Secretary, by choosing to prorate based on geographic location, is overstepping the bounds of his authorized discretion by not furthering the overall purposes of the Act to encourage and protect refineries not having their own source of supply. Brief, pp. 23, 30, 31.

Whether or not the Supreme Court continues to espouse the established two-tier equal protection approach,[12] what is abundantly clear is that purely economic matters traditionally merit only the mildest review under the due process clause. *See, e. g., Craig v. Boren*, 429 U.S. 190, 207, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); *Joseph E. Seagram & Sons v. Hostetter*, 384 U.S. 35, 86 S.Ct. 1254, 16 L.Ed.2d 336 (1966).

Mr. Justice Douglas formally announced this prudential limitation in *Williamson v. Lee Optical of Oklahoma*, 348 U.S. 483, 488, 75 S.Ct. 461, 99 L.Ed. 563 (1955):

> The day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought.

The instant case involves the discontinuance of petitioner's previously accorded ability to purchase royalty oil provided by the federal government—clearly an economic business interest. It has been said that, "In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis', it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.'" *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). (Citations omitted.)

Or, as was explained by the Supreme Court in *City of New Orleans v. Dukes*, 427 U.S. 297, 303–304, 96 S.Ct. 2513, 2516–2517, 49 L.Ed.2d 511 (1976):

> When local economic regulation is challenged solely as violating the Equal Protection Clause, this Court consistently defers to legislative determinations as to the desirability of particular statutory discriminations. See, e. g., *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973). Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race,

---

12. *Compare Massachusetts Board of Retirement v. Murgia* (1976) 427 U.S. 307, 318–22, 96 S.Ct. 2562, 49 L.Ed.2d 520 (Marshall, J., dissenting) with *Craig v. Boren* (1976) 429 U.S. 190, 97 S.Ct. 451, 463, 50 L.Ed.2d 397 (Powell, J., concurring).

religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest. . . . In short, the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines, see, e. g., *Day-Bright Lighting, Inc. v. Missouri*, 342 U.S. 421, 423, 72 S.Ct. 405, 96 L.Ed. 469 (1952); in the local economic sphere, it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendment. See, e. g., *Ferguson v. Skrupa*, 372 U.S. 726, 732, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963).

The Supreme Court's approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment. *See, e. g., Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *Weinberger v. Wiesenfeld*, 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975); *Schlesinger v. Ballard*, 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975); *Jimenez v. Weinberger*, 417 U.S. 628, 637, 94 S.Ct. 2496, 41 L.Ed.2d 363 (1974); *Frontiero v. Richardson*, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973).

Accordingly, we have been taught that the Congress "has great latitude in making statutory classifications in social and economic legislation." *United States v. Weatherford*, 471 F.2d 47, 51 (7th Cir. 1972), cert. denied, 411 U.S. 972, 93 S.Ct. 2144, 36 L.Ed.2d 695. Perfection in making the necessary classification is neither possible nor necessary. *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 314, 96 S.Ct. 2562 (1976), citing *Dandridge v. Williams, supra*, 397 U.S. at 485, 90 S.Ct. 1153. Thus, if the goals sought are legitimate, and the classification adopted is rationally related to the achievement of those goals, then the action of Congress is not so arbitrary as to violate the Due Process Clause of the Fifth Amendment. *Richardson v. Belcher*, 404 U.S. 78, 84, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971).

Congress intended, in amending this section of the Mineral Leasing Act (30 U.S.C. 192), to serve the public interest by providing for the sale of royalty oil to refineries not having their own source of supply. To achieve this objective, the Secretary of the Interior was accorded complete discretion in prorating these government oil supplies as he deems proper. Specific provision was made and, as was previously noted, the legislative history clearly demonstrates that this accords with Congressional intent, for the proration at the discretion of the Secretary of the oil among those refineries in the area in which it is produced.

■ The court must decide then, whether this geographical classification is rationally related to the achievement of the government interests noted above. The court finds that it is.

First, "[t]he Equal Protection Clause relates to equality between persons as such rather than between areas." *Salsburg v. State of Maryland*, 346 U.S. 545, 74 S.Ct. 280, 98 L.Ed. 281 (1954). Accordingly, on numerous occasions the Supreme Court has held that "Territorial uniformity is not a constitutional requisite." *Salsburg, supra*, at 552, 74 S.Ct. at 284. See also *McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); *Missouri v. Lewis*, 101 U.S. 22, 25 L.Ed. 989 (1879). See *United States ex rel. Buonoraba v. Commissioner of Correction*, 316 F.Supp. 556, 564–565 (S.D.N.Y.1970); *Contractors Ass'n. of Eastern Pa. v. Secretary of Labor*, 311 F.Supp. 1002, 1010 (E.D.Pa.1970), aff'd, 442 F.2d 159 (3rd Cir.), cert. denied 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971). "Equal protection of the laws means that no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes in the same place and under like circumstances." *Missouri v. Lewis*, 101 U.S. 22, 31. Such edict is herein being adhered to.

Second, and as has been noted, Congress intended under this Act to commit the practical problems of allocation of a scarce pe-

troleum resource to the Secretary of the Interior and authorized the use of broad discretion on his part in resolving such problems. Great deference should be accorded to his judgment.

The method of distribution established by the Secretary and delineated in the regulations provides for an organizational system consisting of three regional managers, each under the direction of the Chief of the Conservation Division of the U.S. Geological Survey—that agency within the Department of the Interior which administers the royalty oil program.[13] Each region is further divided into one or more geographic "areas" under the jurisdiction of an oil and gas "supervisor". Apparently, most oil and gas activity under this program occurs on federal lands in the western United States and, according to an affidavit submitted by the government (wherein was deposed the Associate Chief of the Conservation Division, U.S. Geological Survey), the jurisdictional boundaries between these geographic areas were established "taking into consideration such factors as distribution of workload, geologic provinces, and political subdivisions as delineated by the boundaries of states and Indian reservations."[14] Affidavit of Hillary A. Oden, p. 5.

Each supervisor is in charge of the distribution of oil produced from within his area, and evidently his primary concern is for the small business refineries located within those geographical confines. For instance, the regulations provide that when royalty oil is available for purchase in his area, the supervisor is to make inquiries of small refiners operating therein as to their interest in filing royalty oil purchase applications. Those refiners are to be given preference over other eligible refiners who are located outside that particular supervisory area but who are also to be notified of available royalty oil when the supervisor

has reason to believe they would be interested in purchasing from his area.

As applications are filed, each area supervisor must determine whether the refinery qualifies as a small business concern unable to purchase in the open market an adequate supply of crude oil to meet existing needs, so as to be considered "eligible" under this provision of the Act. The applications of those "eligible" refiners located outside the particular supervisor's jurisdiction are held in abeyance until actions are completed with respect to the "preference eligible" refiners from his area. Oden affidavit, p. 8. Any excess supplies are then allocated to the former by a drawing, or on an equitable prorated basis as determined by the supervisor.

This scheme of governmental decentralization, based upon area supervisory jurisdiction and geographic "preference", was the method chosen by the Secretary of the Interior for implementing royalty oil allocation under the Act. The rationale behind this decision, and behind the legislative commission granting discretion to the Secretary to prorate the oil among those refineries in the area in which it is produced, is unarticulated. It may be that Congress believed that such distinction would provide production incentives for those refineries located within geographic proximity to the source of the oil, or that it would simply be more equitable to grant purchase priority based upon propinquity to the place of extraction. Petitioner suggests that this geographical preference was accidental and that Congress merely intended to provide for discretionary prorationing, simply not anticipating the possibility that demand for royalty oil would emanate from without the immediate area of production. This may be, or there may be other reasons and explanations, but it is of no matter. It is

**13.** The Geological Survey was established by statute in the Department of the Interior in 1879. It is primarily a fact-finding agency which collects, distributes, and makes available, information about the mineral and water resources of the nation. The Survey conducts research in geology and related fields, prepares and distributes topographical maps, and super-

vises certain technical mineral operations. *See generally* 30 C.F.R. 4294 *et seq.*

**14.** Thus, as depicted in Appendix I, the Eastern Region consists of only one geographic area; the Western Region of two; and the Central Region of three.

enough that another branch of government has determined that especial petroleum resources be provided to a certain category of oil refineries, that the Secretary of the Interior be given responsibility for the adoption of distributional guidelines for their allocation, and that the implementational method chosen be not wholly arbitrary and unrelated to the achievement of the statute's avowed purpose.

The legitimacy of the Congressional objective of providing royalty oil to crude deficient refiners otherwise without an adequate source of supply, is obvious. Legislative classification based upon geographic location as an economic means for administering the program is not unreasonably related to achieving that objective. As explained by the Temporary Emergency Court of Appeals in addressing a challenge to a statute pertaining to a similar type of economic regulation:

> In reviewing the discharge of an agency's function in interpreting the Act, promulgating regulations thereunder and applying and enforcing such regulations, this court has recognized that where administrative control has been congressionally authorized, the 'judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body.'

*Pasco, Inc. v. Federal Energy Administration*, 525 F.2d 1391, 1400 (Em.App.1975).

It is contended that the only governmental interest advanced by this geographic preference scheme is administrative convenience, which is, because of the availability of less restrictive alternatives, said to be insufficient to justify it. Petitioner's mo-

tion, p. 23. However, the fashioning of classifications in aid of administrative convenience is not necessarily violative of constitutional guarantees:

> Such classifications, 'though they may approximate, rather than precisely mirror, the results that case-by-case adjudication would show, are permissible under the Fifth Amendment, so long as that lack of precise equivalence does not exceed the bounds of substantiality (of relation to the statute's purpose) tolerated by the applicable level of scrutiny.' *Mathews v. Lucas*, [427 U.S. 495, 96 S.Ct. 2755, 49 L.Ed.2d 651] (1976).

*Gentry v. United States*, 546 F.2d 343, 353, 354 (Ct.Cl.1976). The court finds that those bounds were not exceeded here, and that under that level of scrutiny accorded to actions regulatory of economic business interests, the challenged portion of the Act and accompanying regulations should not be struck down.

It may well be that a more equitable method of distribution is available and that providing for equal access to royalty oil among all small refiners without regard to geographic location, as has been suggested, may even result in an increase in efficiency. But "[u]nder the system of government created by our Constitution, it is up to legislatures, not courts, to decide on the wisdom and utility of legislation." *Ferguson v. Skrupa*, 372 U.S. 726, 729, 83 S.Ct. 1028, 1030, 10 L.Ed.2d 93 (1963). Our concern here, as often, is with power, not with wisdom. *Helvering v. Davis*, 301 U.S. 619, 644, 57 S.Ct. 904, 81 L.Ed. 1307 (1937). Petitioner's motion for summary judgment is denied. Respondent's motion is granted.[15]

**15.** Petitioner also raises an irrebuttable presumption argument contending that pertinent regulations granting "preference eligible" status based upon geographic location irrebuttably presumes that such procedure best furthers the purpose of the Act, and that "preference eligible" refiners have a greater need for the oil than other "eligible" refiners.

The doctrinal underpinning for such an argument owes itself in large part to Supreme Court action in the early 1970's when the dormant irrebuttable presumption doctrine was revived in constitutional analysis. *Vlandis v. Kline*,

412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973), for example, invalidating a conclusive presumption of non-residency for purposes of tuition and fees at a state university, is cited by petitioner for the proposition that due process is violated when a presumption is not necessarily or universally true in fact, and when the state has reasonable alternative means of making the crucial determination. (*See also Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) where a statute presuming that unmarried fathers are unfit to take custo-

dy of their children upon the mother's death was declared unconstitutional.)

In a recent Second Circuit case, however, Judge Oakes noted that "More recently . . . the Court has narrowed the broad scope of the irrebuttable presumption doctrine evinced in *Vlandis* and progeny." *Sakol v. C. I. R.*, 574 F.2d 694, 697 (2nd Cir. 1978), *cert. denied*, 439 U.S. 859, 99 S.Ct. 177, 58 L.Ed.2d 168. That court, citing the Supreme Court cases of *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975) and *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976), highlights the fact that in the latter the Court "emphasized that conclusive presumptions in economic matters cannot be 'equat[ed]' with presumptions 'in the mold of *Stanley* and *Vlandis*'". *Id.* at 698.

Judge Oakes continued by observing that: While it is difficult to reconcile all of the Supreme Court's pronouncements on the ir-rebuttable presumption doctrine, it seems that in the wake of *Turner Elkhorn* and *Salfi* 'purely economic matters' will not be subject to the demanding test of *Vlandis v. Kline* . . . but rather will be governed by *Turner Elkhorn's* more deferential standard of review. That is to say congressional judgments in the form of 'irrebuttable presumptions' in the economic area will be upheld where there is a rational relationship between the criteria set forth in the statutory mandate and a legitimate congressional purpose. (Citations omitted.)
*Id.* at 698.

Thus, in the instant case, if a presumption does exist, the court does not find it constitutionally impermissible because, as noted, there is a rational relationship between the criteria set forth in both the statute and the regulations and the Congressional purpose elucidated above for which the statute was passed.

APPENDIX I

Source: Submitted by Parties –

680

## APPENDIX II

### § 753.  Mandatory allocation

#### Authority to promulgate regulations covering crude oil, residual fuel oil, and refined petroleum products

(a) Not later than fifteen days after November 27, 1973, the President shall promulgate a regulation providing for the mandatory allocation of crude oil, residual fuel oil, and each refined petroleum product, in amounts specified in (or determined in a manner prescribed by) and at prices specified in (or determined in a manner prescribed by) such regulation. Subject to subsection (d) of this section, such regulation shall take effect not later than fifteen days after its promulgation. Such regulation shall apply to all crude oil, residual fuel oil, and refined petroleum products produced in or imported into the United States.

#### Requisite areas of coverage for regulations; price regulations; unobtainability or curtailment of other fuels; limitations on pricing policy

(b)(1) The regulation under subsection (a) of this section, to the maximum extent practicable, shall provide for—

(A) protection of public health (including the production of pharmaceuticals), safety and welfare (including maintenance of residential heating, such as individual homes, apartments and similar occupied dwelling units), and the national defense;

(B) maintenance of all public services (including facilities and services provided by municipally, cooperatively, or investor owned utilities or by any State or local government or authority, and including transportation facilities and services which serve the public at large);

(C) maintenance of agricultural operations, including farming, ranching, dairy, and fishing activities, and services directly related thereto;

(D) preservation of an economically sound and competitive petroleum industry; including the priority needs to re-store and foster competition in the producing, refining, distribution, marketing, and petrochemical sectors of such industry, and to preserve the competitive viability of independent refiners, small refiners, nonbranded independent marketers, and branded independent marketers;

(E) the allocation of suitable types, grades, and quality of crude oil to refineries in the United States to permit such refineries to operate at full capacity;

(F) equitable distribution of crude oil, residual fuel oil, and refined petroleum products at equitable prices among all regions and areas of the United States and sectors of the petroleum industry, including independent refiners, small refiners, nonbranded independent marketers, branded independent marketers, and among all users;

(G) allocation of residual fuel oil and refined petroleum products in such amounts and in such manner as may be necessary for the maintenance of, exploration for, and production or extraction of—

(i) fuels, and

(ii) minerals essential to the requirements of the United States,

and for required transportation related thereto;

(H) economic efficiency; and

(I) minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms.

Source: 15 U.S.C. § 751 *et seq.*