**LAKETON ASPHALT REFINING, INC., Plaintiff-Appellant,**

v.

**UNITED STATES DEPARTMENT OF the INTERIOR and Cecil Andrus, Secretary of the United States Department of the Interior, Defendants-Appellees.**

**No. 79–1993.**

United States Court of Appeals, Seventh Circuit.

Argued May 2, 1980.

Decided July 3, 1980.

Rehearing and Rehearing En Banc Denied Oct. 7, 1980.

---

John R. Cope, Washington, D. C., for plaintiff-appellant.

Robert L. Klarquist, Dept. of Justice, Washington, D. C., for defendants-appellees.

Before SPRECHER and WOOD, Circuit Judges, and EAST, Senior District Judge.*

SPRECHER, Circuit Judge.

This appeal questions the validity of procedures used by the Secretary of the Interior to implement section 36 of the Mineral Leasing Act, 30 U.S.C. § 192. We hold the challenged procedures to be valid and affirm the judgment below, D.C., 476 F.Supp. 668.

I

The facts are recited substantially as found by the lower court. Section 36 of the Mineral Leasing Act (MLA) provides that royalties accruing to the United States under oil and gas leases it has granted in the public domain, shall, on demand of the Secretary of the Interior, be paid in oil and gas. 30 U.S.C. § 192. As originally enacted, the MLA directed the Secretary to retain these resources for the use of the United States whenever he deemed such a course of action desirable; otherwise, he was to offer for public sale, usually to the highest bidder, all royalty oil and gas accruing to the United States. *Id.*[1]

The practice of selling royalty oil to the highest bidder resulted in purchase domination by the larger oil companies, prompting Congress to amend section 36 to provide as follows:

*Provided*, That inasmuch as the public interest will be served by the sale of royalty oil to refineries not having their own source of supply for crude oil, the Secretary of the Interior, when he determines that sufficient supplies of crude oil are not available in the open market to such refineries, is authorized and directed to grant preference to such refineries in the sale of oil under the provisions of this section, for processing or use in such refineries and not for resale in kind, and in so doing may sell to such refineries at private sale at not less than the market price any royalty oil accruing or reserved to the United States under leases issued pursuant to this chapter: *Provided further*, That in selling such royalty oil the Secretary of the Interior may at his discretion prorate such oil among such refineries in the area in which the oil is produced: . . .

*Id.* The interpretation of this amendment, known as the O'Mahoney Amendment, is at the center of the controversy in this case.

Plaintiff, Laketon Asphalt Refining, Inc. (Laketon), a small, independent crude oil refinery in Indiana whose primary products are asphalt and jet fuel, filed suit against the United States Department of the Interior (DOI) on March 7, 1977, challenging the procedures used by the DOI to allocate royalty crude oil among eligible refiners. For purposes of administering the sale of on-

---

* Honorable William G. East, Senior District Judge for the District of Oregon, is sitting by designation.

1. Section 36 of the MLA reads, in pertinent part:

All royalty accruing to the United States under any oil or gas lease or permit under this chapter on demand of the Secretary of the Interior shall be paid in oil or gas.

Upon granting any oil or gas lease under this chapter, and from time to time thereafter during said lease, the Secretary of the Interior shall, except whenever in his judgment it is desirable to retain the same for the use of the United States, offer for sale for such period as he may determine, upon notice and advertisement on sealed bids or at public auction, all royalty oil and gas accruing or

reserved to the United States under such lease. Such advertisement and sale shall reserve to the Secretary of the Interior the right to reject all bids whenever within his judgment the interest of the United States demands; and in cases where no satisfactory bid is received or where the accepted bidder fails to complete the purchase, or where the Secretary of the Interior shall determine that it is unwise in the public interest to accept the offer of the highest bidder, the Secretary of the Interior, within his discretion, may readvertise such royalty for sale, or sell at private sale at not less than the market price for such period, or accept the value thereof from the lessee: . . .

* * * * * *

30 U.S.C. § 192.

shore royalty crude oil, as well as for administrative efficiency in governing other programs, the DOI has apportioned the continental United States into three broad regions—the Western, Central and Eastern Regions—which are further divided into specific geographic areas—the Alaska and Pacific Areas in the Western Region; the Northern Rocky Mountain, Southern Rocky Mountain and Mid-Continent Areas in the Central Region; and the Eastern Area in the Eastern Region.[2] Under the DOI regulations challenged in this case, those refineries located within the Area from which the royalty oil is produced shall be accorded first priority in the purchase of that oil. Those refiners are called "preference eligible refiners." 30 C.F.R. § 225.2(e).[3]

Because of the past availability of oil, plaintiff had no problem purchasing all the royalty crude oil it needed until 1976. On July 13, 1976, however, when Laketon applied for the purchase of royalty crude oil from the Casper, Wyoming United States Geological Survey (USGS) office,[4] its full demands were not met.

The oil applied for was a high sulphur crude particularly suited to Laketon's refining facilities and a type that Laketon had been purchasing from the USGS office in Wyoming since 1971. The availability of such oil had dwindled, however, because of the burgeoning demand of small refineries located in the Northern Rocky Mountain Area. Since Laketon is located in the Eastern Area of the Eastern Region and the Casper, Wyoming USGS office is located in the Northern Rocky Mountain Area of the Central Region, Laketon was not deemed a "preference eligible refiner" for the Wyoming crude.[5] After the demands of the Northern Rocky Mountain Area preference eligible refiners were satisfied, however, Laketon was eligible to divide the purchase of the residue—approximately 4,300 barrels per day—with four other applicants who were located outside the Northern Rocky Mountain Area.[6] Since plaintiff had applied for the purchase of approximately 6,600 barrels per day, dividing the purchase of the residue with four other eligible refiners was little comfort.[7]

Consequently, on June 15, 1976, Laketon appealed to the DOI for relief from the preference eligibility requirements of the regulations. 30 C.F.R. § 225.3 provides in part that the preferential status accorded certain eligible refiners should be adhered to unless special circumstances, "as determined by the Secretary," warrant otherwise.[8] Laketon urged that such special circumstances were present in its case. On September 15, 1976, before the DOI had

---

2. There is an additional region—the Gulf of Mexico Region—that is used to administer the sale of royalty oil from *offshore* bases. Those leases are not governed by the MLA but instead fall under section 1334 of the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331 *et seq.*

3. (e) "Preference eligible refiners" shall be eligible refiners applying for purchase of royalty oil produced in a given Area for use in their refineries located within that area. 30 C.F.R. § 225.2(e).

4. The USGS is a department within the DOI. One of its functions is to administer the royalty oil disposal program. See 30 C.F.R. § 221.3.

5. The oil available in the Northern Rocky Mountain Area is apparently ideally suited to plaintiff's operations because of its high sulphur content. In the Eastern Area where plaintiff *is* a preference eligible refiner, there is apparently no practical or economically convenient supply of government royalty oil available for purchase.

6. Three of the four other applicants were geographically located outside the Northern Rocky Mountain Area but were within the Central Region; it is clear, therefore, that the critical factor for preference eligibility is Area, not Region.

7. Laketon's certified capacity is 8,500 barrels per day.

8. 30 C.F.R. § 225.3 reads, in pertinent part:
   Except in times of general unavailability of an adequate supply of crude oil in the United States, *or when special circumstances warrant other action, as determined by the Secretary*, government royalty oil available for disposal pursuant to the Act of February 25, 1920, as amended, will be sold in accordance with the regulations in this part.
   \* \* \* \* \* \*
   *Id.* [emphasis supplied].

ruled on the first request, Laketon filed another emergency request for relief from the regulatory requirements.

A conference hearing on the petition for relief was held in Washington, D. C., on October 1, 1976, and on February 2, 1977, a letter to plaintiff from the Acting Assistant Secretary of the Interior explained why the request for relief had to be denied:

> The Department is appreciative of circumstances in which Laketon presently finds itself. However, an assent to your request . . . [for special relief] would be contrary to our current policies and procedures for administering the royalty oil program. Once an exception is made, the precedent is established for further exceptions that would ultimately lead to a situation which would make it impossible to impartially administer the program.

Record, Document No. 25, Exhibit 4.

Plaintiff thereafter filed this suit, alleging statutory and constitutional violations by the Secretary of the Interior in implementing the royalty crude oil program. The lower court granted summary judgment in favor of defendant and plaintiff appealed.[9]

## II

Plaintiff first argues on appeal that the regulations authorizing the DOI to use geographic areas to allocate royalty crude oil are invalid because they were not promulgated in compliance with the notice and comment provisions of section 553 of the Administrative Procedure Act (APA), 5 U.S.C. §§ 551 *et seq.* The APA provides that, with certain exceptions, agencies shall publish in the Federal Register notice of a proposed rulemaking to give interested persons an opportunity to submit written data, views or arguments. See 5 U.S.C. § 553(b). According to plaintiff, defendant simply adopted by fiat in 1973 the DOI's longstanding geographic *administrative* divisions and used them "to define the substantive rights of refiners such as Laketon to purchase royalty crude oil." Brief of Plaintiff at 11. After examining the record in this case, we believe that plaintiff's argument must fail.[10]

▮ Laketon did not expressly raise the notice and comment argument in the district court, and this court ordinarily will not consider arguments raised for the first time on appeal. See *Country Fairways, Inc. v. Mottaz*, 539 F.2d 637, 642 (7th Cir. 1976); *Cannon v. U. S. Acoustics Corp.*, 532 F.2d 1118, 1119 (7th Cir. 1976). While plaintiff did allege in its complaint that the regulations implementing section 36 of the MLA violated due process and were arbitrary, capricious, irrational and subject to judicial review, see Complaint at ¶¶ 4, 12, 13 & 14, it nowhere advanced the specific notice and comment argument advanced here. Even viewing the pleadings in the light most favorable to plaintiff, we find it difficult to see how the district court could have considered this argument.[11] Nevertheless,

---

**9.** Among other things, the district court held that the O'Mahoney Amendment was not superseded by the Emergency Petroleum Allocation Act, 15 U.S.C. §§ 751 *et seq.* Laketon has appealed this aspect of the decision to the Temporary Emergency Court of Appeals (TECA Docket No. 7–10), which has stayed the action pending disposition of the appeal in this court.

**10.** We should point out that the Department of Energy (DOE) was created in 1977 and now has the authority to promulgate regulations specifying the procedures, terms, and conditions of the "disposition of Federal royalty interests taken in kind." 42 U.S.C. § 7152(b)(5). However, actual administration of the royalty oil program remains in the DOI. *Id.* § 7153(a).

On August 3, 1979, the Secretary of Energy published a notice of proposed rulemaking and public hearings regarding the acquisition and disposition of federal royalty oil. 44 Fed.Reg. 45900–09. Although, when promulgated, the new DOE regulations will supersede the DOI regulations in question here, plaintiff's notice argument is not moot. Issues concerning interim regulations are not moot in litigation addressing the period of enforcement. See *BASF Wyandotte Corp. v. Costle*, 582 F.2d 108, 110 (1st Cir. 1978).

**11.** Plaintiff asserts that the notice and comment argument was raised below because the DOI asserted in its Memorandum in Support of Motion For Summary Judgment that it followed notice and comment procedures for the 1969 regulations. Defendant's Memorandum at 10–11, Appendix at 69–70. An examination of that memorandum reveals only that defend-

even if we ignore this procedural problem, plaintiff's argument fails on the merits.

### A

■ As alluded to above, there are certain exceptions to the notice and comment provisions of the APA. Section 553(a)(2) states that the requirements of section 553 are inapplicable to matters

> relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.

5 U.S.C. § 553(a)(2). Before explaining our reasons for holding that the 1973 regulations promulgated by the Secretary were indeed exempt from notice and comment requirements, we must first look at the historical development of the DOI's use of geographic divisions to allocate royalty crude oil.

In 1946, shortly after the passage of the O'Mahoney Amendment, the USGS regulations provided that a "refiner unable to purchase in the open market an adequate supply of crude oil to meet the needs of his existing refinery capacity may file an application with the Director of the Geological Survey" to purchase royalty crude oil. 30 C.F.R. § 225.4 (1946). The Secretary of the Interior was authorized to sell royalty oil when he determined "that sufficient supplies of crude oil are not available to such refineries in the open market." *Id.* § 225.1.

On October 26, 1968, under the authority of section 36 of the MLA, the USGS published in the Federal Register a proposed revision of the onshore royalty oil regulations. The preamble to the proposed regulations stated that if adopted, the regulations "would grant a preference to those eligible refiners whose refineries are located within the supervisory region of the Branch of Oil and Gas Operations, Geological Survey, in which the oil is produced." 33 Fed.Reg. 15872 (October 26, 1968). The notice invited the public to submit comments on the proposed regulations within

thirty days. Final regulations governing the disposal of onshore royalty oil were published on January 23, 1969. 34 Fed.Reg. 1019.

The regulations provided that absent special circumstances, royalty oil would be sold at market price to eligible refiners in accordance with the new regulations. 30 C.F.R. § 225.3 (1970). Moreover, the regulations identified certain refiners as "preference eligible refiners," *i. e.*, those eligible refiners applying for the purchase of royalty oil produced in the region in which they are located. *Id.* § 225.2(e). Section 225.3 of the new regulations provided that

> "Preference eligible refiners" will be given a preference over other "Eligible refiners" in the purchase of such oil.

The term "region" as used in the 1969 regulations was defined as the geographic area under the jurisdictional authority of the appropriate Regional Oil and Gas Supervisor of the USGS. *Id.* §§ 225.2(c), (d). At that time, there were seven such Regional Oil and Gas Supervisors who had jurisdictional responsibility over onshore lands. Those regions were designated as Eastern, Mid-Continent, Northwestern, Southwestern, Alaska, Western and Gulf of Mexico, which included onshore south Louisiana. See Affidavit of Hillary A. Oden, ¶ 3, Record, Document No. 25.

The USGS subsequently revised the geographic divisions by Departmental Manual Release No. 1459 (June 28, 1972), a revision that was published in the Federal Register on April 23, 1973. See 38 Fed.Reg. 10000. Parts 225 and 225a of Title 30 of the Code of Federal Regulations were amended to reflect the geographic changes. Plaintiff correctly states that the 1973 regulatory revisions were not made following notice and comment. We hold, however, that the 1973 revisions did not affect plaintiff's substantive rights and were governed by the exception in section 553(a)(2) of the APA, 5 U.S.C. § 553(a)(2).

---

ant mentioned in passing that it had complied with notice and comment procedures. Plaintiff did not expressly challenge that assertion below, so it was not a "live" issue before the

district court. As stated in the text, *infra*, however, plaintiff's argument must fail on the merits in any event.

In changing the divisions, the USGS simply redesignated the Regions listed above as Areas and transferred some of the supervisory responsibility to other managers. While some of the Areas had names different from the old regional divisions, it is important to note that the land under the jurisdiction of the supervisors was approximately the same under the new area concept as under the pre-reorganization regional concept.[12] Affidavit of Hillary A. Oden, ¶ 3, Record, Document No. 25. This administrative shift by the USGS from regional to area divisions did not affect Laketon: it was in the Eastern Region and was a preference eligible refiner in that Region following the 1969 regulatory change, and is now in the Eastern Area and is a preference eligible refiner in that Area following the 1973 change. We agree with defendant that the 1973

> change was almost entirely a semantical one; what had formerly been known as a "Region" was thereafter called an "Area" . . ..

Brief of Defendant at 20.

Plaintiff acknowledges that section 553(a)(2) of the APA exempts from notice and comment requirements all matters relating to public property or contracts. It argues, however, that the exception is intended to expedite the passage of regulations directly concerning the mechanics of administering public property and contract matters, whereas

> [t]he DOI regulations *in fact directly* and *substantially* extinguish rights of refiners otherwise within the [O'Mahoney] Amendment's class of beneficiaries. Such a result goes far beyond the administration of internal mechanics and proprietary matters which Congress permitted agencies to exempt from the APA.

Reply Brief of Plaintiff at 19–20 [emphasis in original].

Despite plaintiff's argument, there is authority holding that section 553(a)(2) is aimed not only at mechanical rules and interpretation of policy on "public property, loans, grants, benefits, or contracts," but also at substantive rules when the excepted subjects are clearly and directly involved. See *National Wildlife Federation v. Snow*, 561 F.2d 227, 229–32 (D.C.Cir.1976). However, we need not consider whether the 1973 regulatory changes clearly and directly involve public property or contracts because we find that the 1973 changes were not *substantive* but were rather related to agency management.[13] The substantive change in DOI policy came with 1969 "preference eligible" requirements and as stated above, that change was made *after* notice and comment.

### B

Plaintiff contends, however, that the 1968 notice of the proposed rulemaking was not sufficient fairly to apprise interested parties of all significant subjects and issues involved in the proposed rulemaking. Reply Brief of Plaintiff at 22–24. The preamble to the proposed regulations provided as follows:

> The purpose of the proposed revisions is to update the regulations governing the sale of Government royalty oil . . .. The revision would make the regulations consistent with the practice heretofore established of selling such royalty oil at private sale, at the market price, to owners of small refineries who are unable to purchase in the open market an adequate

---

12. The creation of larger regions, subdivided into smaller areas, was in response to President Nixon's directive to decentralize federal agencies and to delegate additional authority to field officials. There were five instances where certain states were removed from the jurisdiction of one supervisor to comply with the regional boundaries set by the Executive directive. Plaintiff's state of Indiana, however, was unaffected. See Affidavit of Hillary A. Oden, at ¶ 3, Record, Document No. 25.

13. See note 12, *supra*, and the accompanying text. Plaintiff argues that even a procedural rule can be subject to notice and comment requirements if it has a substantial impact on the rights of regulated parties. See *Nat'l Motor Freight Traffic Ass'n v. U. S.*, 268 F.Supp. 90 (D.D.C.1967), *aff'd per curiam*, 393 U.S. 18, 89 S.Ct. 49, 21 L.Ed.2d 19 (1968). This argument is clearly inapplicable here because the 1973 change did not affect plaintiff's status at all.

supply of crude oil to meet the needs of their existing refinery capacities. *The revision also would grant a preference to those eligible refiners whose refineries are located within the supervisory region of the Branch of Oil and Gas Operations, Geological Survey, in which the oil is produced.*

33 Fed.Reg. 15872 (October 26, 1968) [emphasis supplied].

■ Despite this explicit statement, plaintiff argues that the notice did not sufficiently reveal that the DOI intended to create "a geographic eligibility requirement effectively excluding Laketon and most other eligible refiners from access to royalty crude oil." Reply Brief of Plaintiff at 23. Surely an agency is under no obligation to explain in the notice of a proposed rulemaking the impact of the rule on each interested party. It need only provide enough information to alert interested parties to the potential effect of a rule, and the 1968 notice clearly provided that information.

Section 225.3 of the proposed regulation expressly provided that

"Preference eligible refiners" will be given a preference over other "Eligible refiners," in the purchase of such oil.

Moreover, "preference eligible refiners" were clearly defined as

eligible refiners applying for purchase of royalty oil produced in a given Region for use in their refineries located within that Region.

Proposed Regulation § 225.1(e), 33 Fed.Reg. 15873 (October 26, 1968). For further clarification, proposed section 225.1(d) defined "Region" as

the area over which a Supervisor is authorized to exercise supervisory jurisdiction.

33 Fed.Reg. 15873. Plaintiff itself concedes that the DOI has used regional divisions for administering matters other than preference for royalty oil since 1946, see Brief of Plaintiff at 12, and we do not hear it to

argue that the published notice failed to apprise it of which Region it was in.

Based on the foregoing excerpts from the 1968 notice, we find it difficult to understand plaintiff's statement that

Laketon, as a prior participant in the royalty oil program . . ., had no reason to conclude that it would be geographically excluded, because geographic eligibility was not a previously established requirement.

Reply Brief of Plaintiff at 23. In the first place, the preamble to the proposed regulations specifically states that the revision is intended to grant a preference to those refineries located within the Region where the royalty oil is produced. And in the second place, Laketon has *not* been geographically *excluded* from the royalty oil program.

In the February 2, 1977, letter from the Acting Assistant Secretary of the Interior to Laketon, denying plaintiff's request for emergency relief from the preference eligibility requirements, the Acting Assistant Secretary wrote:

It is true, given the present circumstances, that Laketon no longer enjoys its former favorable position in regard to the purchase of onshore royalty oil. However, in our opinion, this situation has not resulted entirely from the fact that Laketon is a "preference eligible" refiner only in the Eastern Area where the volume of royalty oil is small and is produced from widely scattered sources. At the present time, Laketon is as qualified as any other small business refiner to acquire OCS [14] royalty oil and that onshore royalty oil produced in Alaska. Yet, Laketon did not apply for OCS royalty oil off California or for that in Alaska when these sources were last made available. However, according to the records of the Geological Survey, Laketon now has a royalty oil contract for OCS royalty oil produced in the Gulf of Mexico amounting to 1,853 barrels per day and another contract for 1,100 to 1,460 barrels per day

14. This refers to the purchase of offshore royalty oil governed by section 1334 of the Outer

Continental Shelf Lands Act, 43 U.S.C. §§ 1331 *et seq.* See note 2 *supra.*

which is pending in the office of the Area Oil and Gas Supervisor, Casper, Wyoming. With the consummation of this second contract, it would seem that Laketon has had reasonable success in acquiring royalty oil despite the greatly increased competition therefor.

Record, Document No. 25, Exhibit 4.

In sum, we have considered all of plaintiff's arguments concerning possible notice and comment defects in the present regulation and find that they are all without merit. We will therefore turn our attention to its other challenges.

### III

Plaintiff contends that the district court erred in concluding that the DOI's use of a geographic preference system was rationally related to the O'Mahoney Amendment. This attack takes several different forms.

First, Laketon argues that while the purpose of the O'Mahoney Amendment is to make royalty crude oil available to refiners lacking a source of crude oil, the DOI's motivation for making geographic divisions in 1946 was solely administrative convenience. As evidence that the use of those geographic divisions is not rationally related to the purpose of the Amendment, plaintiff relies heavily on a statement by defendant that the 1946 geographic divisions were not "prepared in relation to any consideration of the needs of small business refiners for government royalty crude oil within the respective regions." Defendant's Response to Plaintiff's Interrogatory No. 2, Appendix at 56. This argument by plaintiff clearly misses the mark.

■ The proper focus is *not* whether the geographic divisions were *initially* promulgated to further the purpose of the O'Mahoney Amendment, but rather whether the 1969 *adoption* of those divisions to determine preference eligibility was rationally related to the purpose of the O'Mahoney Amendment. For reasons that will be developed, *infra*, we hold the 1969 regulatory change is indeed rationally related to the purpose of the Amendment.

Plaintiff disagrees, however, arguing strongly that the use of *any* geographic preference system is contrary to the purpose of the Amendment. In support of its argument, Laketon cites the recent Tenth Circuit decision in *Plateau, Inc. v. Department of the Interior*, 603 F.2d 161 (10th Cir. 1979).

In that case, the court invalidated a DOI regulation which narrowed the definition of an eligible refiner. In addition to requiring for purchase eligibility that a refiner be crude deficient, the regulation required that the refiner be a "small business enterprise" as defined by the Small Business Administration (SBA). See 30 C.F.R. § 225.2 (1978). Applications for the purchase of royalty oil by refiners not meeting *both* of those criteria were rejected out of hand.

The Secretary argued that under the second proviso of the O'Mahoney Amendment, he had the authority to adopt the SBA definition as a condition precedent for eligibility. The relevant language of the Amendment is as follows:

That in selling such royalty oil the Secretary of the Interior may at his discretion prorate such oil among such refineries in the area in which the oil is produced:

. . .

30 U.S.C. § 192. Refusing to give the word "prorate" such a strained meaning, the Tenth Circuit held that the language of the Amendment did not give the Secretary authority to narrow the statutory definition of eligible refiners. 603 F.2d at 164.

In support of its holding, the *Plateau* court relied on the legislative history of the Amendment as well as on the administrative history of the DOI regulations. According to the court,

the [legislative] history . . . reveals that Congress went to some effort to define the class of beneficiaries. That class, as defined, consists of refineries without their own sources of crude oil.

*Plateau, supra*, 603 F.2d at 163. Moreover, in examining the administrative history of the regulations, the court found inconsistency by the Secretary. While the regulations from 1946 until 1960 reserved in the Secre-

tary the right to make equitable allocations among competing, qualified refiners, they did not suggest that the Secretary would take the step he took in 1960 to impose the new "small business enterprise" requirement for eligibility. *Id.* at 164.

Because of the inconsistency in the DOI's interpretation of the Amendment, the *Plateau* court refused to give deference to the agency's post-1960 interpretation. Cf. *Udall v. Tallman*, 380 U.S. 1, 4, 85 S.Ct. 792, 795, 13 L.Ed.2d 616 (1965) (deference given to consistent administrative interpretation). Stating that the language of the Amendment itself identifies the refineries it is intended to benefit and finding that the challenged regulation went too far, the court invalidated the regulation. 603 F.2d at 164.

Laketon argues that the analysis used in *Plateau* warrants our finding that the geographic eligibility requirements are likewise unauthorized by the language of the Amendment. In particular, plaintiff seeks solace in the Tenth Circuit's refusal to give deference to inconsistent agency interpretation. As stated above, the DOI did not adopt the geographic preference system until 1969—more than twenty years after the passage of the O'Mahoney Amendment and in contrast to more than twenty years of agency practice.

Quoting from *Plateau*, Laketon argues that the pre-1969 regulations *"did not suggest that the Secretary would impose new qualifications on eligibility,"* Reply Brief of Plaintiff at 9, quoting *Plateau, supra*, 603 F.2d at 164 [footnote omitted] [emphasis by plaintiff]; thus, the post-1969 regulations should be given no weight. Instead, plaintiff urges that weight should be given to the regulations promulgated in 1946 which

defined an eligible refiner as one "unable to purchase in the open market an adequate supply of crude oil to meet the needs of his existing refinery capacity . . . ." Reply Brief of Plaintiff at 9, quoting Proposed Regulation § 225.4, 11 Fed.Reg. 10580 (September 20, 1946). See *Norwegian Nitrogen Products Co. v. U. S.*, 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933) (weight given to earliest interpretation because it "involves a contemporaneous construction of a statute by the men charged with setting its machinery in motion . . . ."). Since the basic purpose of the O'Mahoney Amendment is to make royalty oil available to crude deficient refiners, Laketon argues that the DOI's attempt "to render eligibility for royalty crude oil a function of geographic location . . . is clearly in excess of [that] statutory authority . . ." Brief of Plaintiff at 21.

Despite the superficial appeal of plaintiff's argument, it cannot withstand scrutiny in light of a closer examination of *Plateau* and of the O'Mahoney Amendment itself. While it is true that the first proviso of the O'Mahoney Amendment expressly directs the Secretary to sell royalty oil to refineries not having their own supply of crude oil,[15] plaintiff would have us either ignore or give a strained interpretation to the second proviso which grants to the Secretary authority to prorate such royalty oil among the eligible refiners "in the area in which the oil is produced. . . ." 30 U.S.C. § 192. Unlike the regulation invalidated in *Plateau*, the geographic preference in this case is not an attempt by the Secretary to alter without statutory support the general class of refiners deemed eligible by the Amendment; rather, as acknowledged

---

**15.** The first proviso of the Amendment reads as follows:

That inasmuch as the public interest will be served by the sale of royalty oil to refineries not having their own source of supply for crude oil, the Secretary of the Interior, when he determines that sufficient supplies of crude oil are not available in the open market to such refineries, is authorized and directed to grant preference to such refineries in the

sale of oil under the provisions of this section, for processing or use in such refineries and not for resale in kind, and in so doing may sell to such refineries at private sale at not less than the market price any royalty oil accruing or reserved to the United States under leases issued pursuant to this chapter:

. . .

30 U.S.C. § 192.

by the *Plateau* court,[16] the geographic preference regulations are an attempt by the Secretary to comply with the express language of the Act. We agree that

> the language [of the second proviso] means that if demand is greater than supply the Secretary may allocate supplies on a prorated basis among "such refineries": refineries in the vicinity which lack adequate supplies of crude oil.

*Plateau, supra*, 603 F.2d at 164–65 [footnote omitted].

Contrary to Laketon's assertion and as implicitly acknowledged by the *Plateau* court, the DOI's geographic preference system is *not a narrowing* of the statutory definition of eligibility. Unlike the invalid "small business enterprise" requirement which was a condition precedent to consideration of an application for royalty oil, the geographic preference system does *not* alter the definition of "eligibility." Instead, it aids the Secretary in prorating royalty oil among eligible refiners "if demand is greater than supply . . . ." *Plateau, supra*, 603 F.2d at 164.

The practice followed by the DOI since the 1969 "preference eligible" regulations were adopted supports this analysis. Until the supply of crude oil became insufficient to meet demand, royalty oil was sold to eligible refiners—those not having their own source of supply for crude oil—without any proration according to geographic area. Such a practice would not have been followed if the DOI were attempting to narrow the statutory definition of eligible refiners. It was not until approximately 1973, because of the growing disparity between the supply of domestic crude oil and refining capacity coupled with the Arab oil embargo late in that year, that the Secretary exercised his discretion to prorate oil among refineries in the Area in which the oil was produced. See Affidavit of Hillary

A. Oden, ¶¶ 7 & 8, Record, Document No. 25.

It is undisputed that until 1976, Laketon could purchase from what is now called the Northern Rocky Mountain Area all the crude oil it needed. Indeed, as discussed in Parts I and II, *supra*, even when demand exceeded supply, plaintiff was still able under the DOI regulations to purchase royalty oil not only from the Casper, Wyoming office of the USGS, but also from other areas in which it was not deemed "preference eligible." These facts fatally undercut plaintiff's assertions that the regulations

> purport to totally prevent refiners outside of a geographical area . . . from acquiring royalty crude oil,

Brief of Plaintiff at 31, and

> have effectively precluded Laketon from obtaining access to royalty crude oil . . . .

*Id.* at 35.

Furthermore, we decline to accept plaintiff's invitation to invalidate the geographic preference system merely because the DOI did not follow that system in 1946. While deference to consistent and contemporaneous agency interpretation is warranted in many cases, we will not strike down a valid regulatory change clearly authorized by a statute simply because it is different from prior agency practice. Cf. *S.E.C. v. Sloan*, 436 U.S. 103, 117–18, 98 S.Ct. 1702, 1711–1712, 56 L.Ed.2d 148 (1978) (despite consistent agency interpretation, regulation not valid when contrary to congressional mandate).

### IV

Laketon also argues that even if the DOI has statutory authority to promulgate a classification based upon geographic eligibility, its use of the 1946 geographic administrative divisions is totally irrational.[17]

---

**16.** See *Plateau, Inc. v. Department of the Interior*, 603 F.2d 161, 164 & n.8, 164–65 (10th Cir. 1979).

**17.** In its brief on appeal, the DOI argues that the Secretary's geographic allocation of royalty oil is not subject to judicial review. Under

section 701(a)(2) of the APA, "agency action . . . committed to agency discretion by law" is exempt from judicial review, 5 U.S.C. § 701(a)(2); defendant asserts that its actions fit within this exemption. We disagree.

In *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d

According to plaintiff, the geographic divisions allow only a miniscule percentage of eligible refiners actually to receive the benefits mandated by the Amendment. While approximately 54% of the country's eligible refiners are located in the Eastern and Mid-Continent Areas, areas that have no practicably available royalty crude oil, only 9% of the eligible refiners are located in the Northern Rocky Mountain Area, an area that contains 74% of all royalty crude oil.

As recognized by the trial court, this argument by plaintiff is essentially an equal protection argument and involves an economic business interest—the limitation of Laketon's previously accorded ability to purchase royalty oil.[18]  476 F.Supp. 668, at 676 (N.D.Ind.1979).  Since this challenge is to federal, and not state, power, the Fifth Amendment is the proper touchstone for our analysis.  See *Shapiro v. Thompson*, 394 U.S. 618, 641–42, 89 S.Ct. 1322, 1335, 22 L.Ed.2d 600 (1969).  The United States Su-

preme Court's approach to Fifth Amendment equal protection claims has, however, always been precisely the same as its approach to Fourteenth Amendment equal protection claims, see, e. g., *Weinberger v. Wiesenfeld*, 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975);  *Schlesinger v. Ballard*, 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975), so that cases considering equal protection challenges to state regulations are instructive in our analysis.

■■■  At the outset, we must point out that economic discrimination as alleged here, where neither fundamental rights nor suspect classifications are involved, is entitled only to the mildest review.[19]  See *U. S. v. Weatherford*, 471 F.2d 47, 51 (7th Cir. 1972), *cert. denied*, 411 U.S. 972, 93 S.Ct. 2144, 36 L.Ed.2d 695 (1973).  Legislative perfection in making a statutory classification is neither possible nor necessary, *Dandridge v. Williams*, 397 U.S. 471, 485, 90

136 (1971), the Supreme Court stated that the judicial review exemption applies "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'"  *Id.* at 410, 91 S.Ct. at 821 [citation omitted].  The DOI's use of geographic divisions to allocate royalty oil is not one of "those rare instances where  .  .  .  'there is no law to apply'," *id*; rather, its use of a geographic allocation system emanates directly from the language of the second proviso of the O'Mahoney Amendment.  See 30 U.S.C. § 192.

Defendant acknowledges that Congress refused to adopt a version of the Amendment which would have vested "*complete* discretion in the Secretary of the Interior to determine to whom the oil should be sold in accordance with his findings as to how the public interest would best be served."  S.Rep.No. 566, 79th Cong., 1st Sess., at 3 (1945) [emphasis supplied].  Were that the language of the statute before us now, we might indeed be faced with one of "those rare instances  .  .  .  ." *Volpe, supra*, 401 U.S. at 410, 91 S.Ct. at 820.  However, the version of the O'Mahoney Amendment which ultimately was passed by Congress does not give to the Secretary unfettered discretion to prorate available royalty oil in *any* way he desires.  Rather, as recognized by the court in *Plateau, Inc. v. Department of the Interior*, 603 F.2d 161 (10th Cir. 1979), the Secretary's discretion is limited by the language of the Amendment:  the proration must be made among eligible refiners in the Area in which the oil is produced.

Nevertheless, as discussed in the text, *infra*, our review of the boundaries established and

used for royalty oil allocation is necessarily an extremely limited one.

18.  We are unpersuaded by plaintiff's argument that the deferential analysis applicable to economic policy is somehow inapplicable here. Brief of Plaintiff at 29 n.12.  Contrary to plaintiff's assertion, this is indeed a case where the geographic classifications used by defendant reflect "an assessment of the legislative purposes to be fulfilled," see *id.*, and that purpose is essentially an economic one.

19.  In *New Orleans v. Dukes*, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976), the Supreme Court discussed the limited nature of judicial review in an economic discrimination case:

When  .  .  .  economic regulation is challenged solely as violating the Equal Protection Clause, this Court consistently defers to legislative determinations as to the desirability of particular statutory discriminations.

\*  \*  \*  \*  \*  \*

In short, the judiciary may not sit as a super-legislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines  .  .  ;  in the  .  .  .  economic sphere, it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendment.

*Id.* at 303–04, 96 S.Ct. at 2517 [citations omitted].

S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970), and the classification will not be set aside if any state of facts reasonably may be conceived to justify it. *McGowan v. Maryland*, 366 U.S. 420, 425–26, 81 S.Ct. 1101, 1104–1105, 6 L.Ed.2d 393 (1961). Moreover, as the party challenging the regulation, plaintiff has the burden of showing that the geographic divisions are wholly arbitrary. *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364, 93 S.Ct. 1001, 1006, 35 L.Ed.2d 351 (1973). Plaintiff has not carried that burden in this case.

The implementation of the O'Mahoney Amendment must be viewed in the context of the MLA as a whole. The marketing of royalty oil is a relatively small portion of administering the Act, and the Area boundaries were drawn rationally to distribute those administrative tasks entrusted under the Act to the Conservation Division of the USGS. The boundaries were established by taking into account factors such as workload distribution, geological provinces and political subdivisions. See Affidavit of Hillary A. Oden, ¶ 6, Record, Document No. 25.

Plaintiff has not shown that the O'Mahoney Amendment requires the Secretary to establish a new administrative structure solely for the purpose of marketing royalty oil. In fact, the legislative history of the Amendment suggests that the exercise of the Secretary's discretion in prorating the oil is by necessity grounded in administrative efficiency:

> Mr. Kean: Can the gentleman explain how the Secretary of the Interior will decide in favor of any particular oil company?

> Mr. Barrett: The bill provides that small refineries operating in the area in which the oil is produced may request the Secretary to sell them Government royalty oil at the price established by the Secretary, and it authorizes the Secretary to pro rate the oil according to needs as he deems proper.

> Mr. Kean: It is entirely at the discretion of the Secretary of the Interior?

> Mr. Barrett: *That is right. The Secretary must administer the bill, and the discretion must lay in his hands.*

92 Cong.Rec. 8160 (July 2, 1946) [emphasis supplied].

We have already determined that the use of geographic boundaries in general is rationally related to the purpose of the O'Mahoney Amendment, see Part III, *supra*, and it is not the proper role of a court to substitute its judgment for that of the Secretary in determining precisely what those boundaries should be.[20]

It is simply a geological fact of life that most onshore oil and gas activity—including production—occurs on federal lands in the western United States, with only small, widely-scattered activities being conducted on federal lands east of the Mississippi River. See Affidavit of Hillary A. Oden, ¶ 6, Record, Document No. 25. Congress expressly authorized the Secretary to prorate at his discretion royalty oil in the area in which it is produced, and we do not find the geographic boundaries challenged in this case to be an irrational exercise of that discretion.[21]

Plaintiff argues that administrative convenience is the only justification for the geographic scheme and that such a justifi-

---

**20.** Section 706(2)(A) of the APA, 5 U.S.C. § 706(2)(A), requires that we set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Plaintiff correctly points out that under section 706(2)(A), "we may not supply a reasoned basis for the agency's action that the agency itself has not given," *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285–86, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974), but as discussed in the text, *infra*, the agency has "suppl[ied]" a reasoned basis for [its] action."

**21.** It is immaterial that the DOI does not use a geographic preference system to administer the sale of offshore oil. See Reply Brief of Plaintiff at 10–11. As stated in notes 2 and 14, *supra*, the sale of offshore royalty oil is governed by section 1334 of the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331 *et seq.*, not by the MLA. The Outer Continental Shelf Lands Act has no provision analogous to the second proviso of the O'Mahoney Amendment to the MLA.

cation is insufficient. However, creating classifications to aid administrative convenience is not necessarily violative of constitutional guarantees. As the Supreme Court said in *Mathews v. Lucas,* 427 U.S. 495, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976):

> [T]hough [such classifications] may approximate, rather than precisely mirror, the results that case-by-case adjudication would show, [they] *are* [nevertheless] *permissible under the Fifth Amendment, so long as that lack of precise equivalence does not exceed the bounds of substantiality tolerated by the applicable level of scrutiny.*

*Id.* at 509, 96 S.Ct. at 2764 [emphasis supplied]. As stated above, only the mildest scrutiny is available in a case like this, and we cannot say that the Secretary has acted irrationally. Plaintiff has not been totally excluded from the royalty oil program and it is not sufficient for it to argue that the regulations preclude it from purchasing as much oil as it would like.

## V

We next address Laketon's contention that even if the geographic preference system is upheld, we should find as a matter of law that 30 C.F.R. § 225.4 is in direct conflict with the express language of the O'Mahoney Amendment. The Amendment states that royalty crude oil is to be sold to eligible refiners "for processing or use in such refineries and *not for resale in kind* . . . ." 30 U.S.C. § 192 [emphasis supplied]. The regulation states that

> [a]greements providing for the exchange of crude oil purchased under the act for other crude oil on a volume or equivalent value basis will not be construed as constituting a resale in kind prohibited by the act.

30 C.F.R. § 225.4. Plaintiff argues that "not for resale in kind" should be interpreted to exclude the exchange agreements authorized by the regulation.

■ Since 1946, shortly after the passage of the O'Mahoney Amendment, DOI regulations have consistently authorized exchange agreements. As mentioned in Part III, *su-*

*pra,* an agency's *contemporaneous* interpretation of a statute, *Power Reactor Development Co. v. Electricians,* 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961), as well as its *consistent* interpretation of that statute, *Udall v. Tallman,* 380 U.S. 1, 4, 85 S.Ct. 792, 795, 13 L.Ed.2d 616 (1965), is entitled to deference by the courts. Of course, we do not mean to suggest that courts should defer to a contemporaneous, consistent agency interpretation that is clearly outside the meaning and purpose of a statute, see *S.E.C. v. Sloan,* 436 U.S. 103, 117–18, 98 S.Ct. 1702, 1711–1712, 56 L.Ed.2d 148 (1978), but that is not the situation presented in this case.

Both parties acknowledge that the purpose of the O'Mahoney Amendment is to aid crude deficient refiners in the purchase of crude oil actually to be processed in their refineries. See Brief of Defendant at 31; Reply Brief of Plaintiff at 2. The prohibition against "resale in kind" is aimed at preventing eligible refiners from becoming, in effect, crude oil brokers who purchase royalty oil which they then resell to third parties.

■ In allowing exchange agreements, the DOI has not thwarted congressional intent, but rather has furthered it. Such agreements not only assist crude deficient refineries in acquiring crude of a type suitable for processing in their plants, but also compensate for the sometimes prohibitive trucking costs involved in transporting the oil. See Affidavit of Hillary A. Oden, ¶ 12, Record, Document No. 25.

We appreciate the fact that had eligible refiners been unable to enter into exchange agreements, plaintiff would have been able to purchase from the Northern Rocky Mountain Area the oil it requested. As mentioned in note 5, *supra,* the oil plaintiff sought to purchase from the Casper, Wyoming office of the USGS was a high sulphur crude particularly suited to use in its refinery. That type of crude was not, however, suited for use in the refineries of most of the other eligible applicants, who, after being granted a purchase contract, entered into exchange agreements to obtain the

type of oil suited to their needs. But this fact merely highlights the desirability of exchange agreements to further the purpose of the Amendment. Without exchange agreements, many eligible refiners and intended beneficiaries of the Amendment would be unable to participate in the royalty oil program.

We do not find that the use of the words "not for resale in kind" was an attempt by Congress to prohibit exchange agreements. We accept the DOI's position that the limited use of exchange agreements as allowed by the regulations is not contrary to the mandate of the statute. We cannot say that such an interpretation is arbitrary, capricious or an abuse of discretion; it seems rather to further the purpose of the Amendment.[22]

Accordingly, we hold that 30 C.F.R. § 225.4 is rationally related to the purpose of the O'Mahoney Amendment.

### VI

We have carefully considered all of plaintiff's assertions of genuine issues of material fact that should have precluded the district court's summary judgment in favor of defendant, see Fed.R.Civ.P. 56, and we find them all without merit. The focus of the dispute in this case has been on questions of law, and to the extent that the judgment below has been appealed to this court, see note 9, *supra*, we hold that the district court properly granted summary judgment in favor of defendant.

AFFIRMED.

---

**22.** At oral argument, defendant suggested that the inclusion of the words "in kind" was in all probability a way of limiting the statute so as not to prohibit the subsequent sale of a refined product.